# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **BELINDA GAIL JUSTUS,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:11cv00014 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | By: Pamela Meade Sargent |
| Defendant | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Belinda Gail Justus, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq.* (West 2003 & Supp. 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a

Case 1:11-cv-00014-JPJ-PMS   Document 16   Filed 05/09/12   Page 1 of 27   Pageid#: 661

particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Justus protectively filed her application for SSI on March 23, 2007, alleging disability as of April 1, 2006, due to nerves, migraine headaches, split personality and hepatitis B and hepatitis C. (Record, ("R."), at 170-72, 188, 198.) The claims were denied initially and on reconsideration. (R. at 49-51, 54, 60-61.) Justus then requested a hearing before an administrative law judge, ("ALJ"). (R. at 62.) The hearing was held on May 19, 2010, at which Justus was represented by counsel. (R. at 23-46.)

By decision dated June 15, 2010, the ALJ denied Justus's claim. (R. at 14-22.) The ALJ found that Justus had not engaged in substantial gainful activity since March 23, 2007, the date of her application. (R. at 16.) The ALJ determined that the medical evidence established that Justus suffered from severe impairments, including migraine headaches, hepatitis B and C, gastroenteritis, epigastric pain, esophageal reflux, diarrhea, depression and panic attacks, but he found that Justus did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16-18.) The ALJ found that Justus had the residual functional capacity to perform medium work[1] that required the performance of no more than short, simple instructions and

---

[1] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting of items weighing up to 25 pounds. If someone can perform medium work, she also can perform light and sedentary work. *See* 20 C.F.R. § 416.967(c) (2011).

no more than occasional interactions with co-workers and with the public. (R. at 18-21.) The ALJ found that Justus had no past relevant work. (R. at 21.) Based on Justus's age, education, lack of work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found that Justus could perform jobs existing in significant numbers in the national economy, including jobs as a cleaner at the light[2] level of exertion, a laundry worker at the medium level of exertion and a laundry folder at the light level of exertion. (R. at 21-22.) Therefore, the ALJ found that Justus was not under a disability as defined under the Act and was not eligible for benefits. (R. at 22.) *See* 20 C.F.R. § 416.920(g) (2011).

After the ALJ issued his decision, Justus pursued her administrative appeals, (R. at 9), but the Appeals Council denied her request for review. (R. at 1-6.) Justus then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2011). The case is before this court on Justus's motion for summary judgment filed July 20, 2011, and the Commissioner's motion for summary judgment filed August 19, 2011.

## II. Facts

Justus was born in 1978, (R. at 27), which classifies her as a "younger person" under 20 C.F.R. § 416.963(c). She has a seventh-grade education and no

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 416.967(b) (2011).

past relevant work experience.  (R. at 28, 32-33.)  Justus testified that she stayed home most of the time, did a little housework and sometimes visited family.  (R. at 30-31.)  Justus also stated that she sometimes walked approximately a mile while her kids rode their bikes.  (R. at 31.)  She stated that she typically went back to bed for about an hour once daily.  (R. at 31.)  Justus also testified that she suffered from migraine headaches once weekly or once every other week, lasting for two to three days at a time.  (R. at 34-35.)  She testified that she had both hepatitis B and C, which caused her stomach pain and diarrhea approximately two or three times daily.  (R. at 35-36.)

Justus testified that she was depressed and had attempted suicide in 2006 and had continued suicidal thoughts at times.  (R. at 37.)  She also stated that she had crying spells once or twice a week or every other week when she was depressed.  (R. at 37-38.)  She stated that she had panic attacks about twice a week, lasting approximately 10 minutes, and she stated that she became very nervous if she had to go in public places.  (R. at 38-39.)  She testified that her depression and anxiety would prevent her from working because she could not be around people due to her nerves.  (R. at 40.)  Justus stated that she could not work a job even if she did not have to be around others because she would get "paranoid or … scared."  (R. at 40.)

Donald Anderson, a vocational expert, also was present and testified at Justus's hearing.  (R. at 41-45.)  When asked to assume a hypothetical individual of Justus's age, education and lack of work experience who had the physical capabilities set forth in Dr. Ravi Titha's August 26, 2009, assessment and the psychological capabilities set forth in Dr. Mina Patel's May 21, 2009, assessment,

- 4 -

Anderson testified that such an individual could perform simple tasks that did not require public contact or use of judgment. (R. at 42-43.) Anderson testified that such an individual could perform the jobs of a cleaner and a laundry folder, both at the light level of exertion, and a laundry worker at the medium level of exertion. (R. at 43-44.) When Anderson was asked to consider a hypothetical individual who had some days when she was doing "pretty good" and other days when she spent "a lot of time crying and in her room and sleeping," resulting in an absence of at least one day of work weekly, he testified that such an individual could not perform any jobs. (R. at 44-45.) Lastly, Anderson testified that an individual who had to rest at least an hour a day, and on some occasions, two hours a day, could not perform any jobs. (R. at 45.)

On April 2, 2007, Justus was admitted to The Laurels after losing custody of her two children due to alcohol use and use of Ritalin and cocaine. (R. at 351, 372.) She was discharged on April 8, 2007. (R. at 351.) On May 4, 2007, she was diagnosed with polysubstance dependence, opioid, and her then-current Global Assessment of Functioning, ("GAF"),[3] score was placed at 53.[4] (R. at 353.) On April 12, 2007, Justus reported an increase in depressive symptoms. (R. at 361.) She also reported a significant period of trouble understanding, concentrating or remembering in the previous 30 days unrelated to drug/alcohol use. (R. at 361.) She denied having used any drugs or alcohol since discharge from The Laurels.

---

[3] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[4] A GAF score of 51 to 60 indicates "[m]oderate symptoms … OR moderate difficulty in social, occupational, or school functioning …." DSM-IV at 32.

(R. at 364.) On mental status examination, Justus was cooperative and calm with an appropriate affect. (R. at 368.) She reported no hallucinations or delusions, no suicidal or homicidal ideations, orientation was intact, immediate memory was impaired, concentration was impaired, insight was limited, and judgment was limited. (R. at 368.) Justus was scheduled to begin a weekly substance abuse group. (R. at 369.) Justus attended one such group session on April 17, 2007. (R. at 369.)

Also on April 12, 2007, Justus saw Dr. Joselin Tacas Tacas, M.D., for complaints of anxiety. (R. at 416-19.) She stated that Klonopin helped her condition. (R. at 416.) She also reported no recent history of coughing, unclear phlegm, hemoptysis, wheezing, pain on breathing, chest congestion or recent inhalant exposure. (R. at 417.) Dr. Tacas Tacas noted Justus's shortness of breath was stable with the use of an inhaler and that her depression and anxiety were controlled with medication. (R. at 417.) Examination of Justus's respiratory system revealed the bony thorax was intact without deformities, there was symmetrical chest expansion bilaterally, she had a normal respiratory rate and pattern, bilaterally resonant lung fields, equally palpable vibrations, no rales, no rhonchi, no wheezing and no pleuritic rubs, but there were diminished breath sounds. (R. at 418.) Dr. Tacas Tacas diagnosed chronic general anxiety disorder, controlled. (R. at 419.) She refilled Justus's Klonopin. (R. at 419.)

On June 14, 2007, Richard J. Milan Jr., Ph.D., a state agency psychologist, completed a Mental Residual Functional Capacity Assessment, finding that Justus was moderately limited in her ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods,

- 6 -

to work in coordination with or proximity to others without being distracted by them and to interact appropriately with the general public. (R. at 383-85.) Milan found Justus's statements partially credible. (R. at 385.) He concluded that she could understand, remember and carry out simple work instructions under ordinary supervision, concentrate with fair effectiveness and persist at work routines to completion, working within a schedule. (R. at 385.) He further found that she could maintain an acceptable pace of work activity, interact adequately with others in a work setting to complete simple work routines, adapt self-sufficiently at work, adjusting to changes and maintaining personal safety. (R. at 385.) Milan concluded that Justus was able to meet the mental demands of competitive work on a sustained basis despite the limitations resulting from her impairment. (R. at 385.)

Milan also completed a Psychiatric Review Technique form, ("PRTF"), finding that Justus had an affective disorder and a substance addiction disorder and that a residual functional capacity assessment was necessary. (R. at 386-99.) Milan opined that Justus was mildly restricted in her activities of daily living, experienced moderate difficulties in maintaining social functioning, experienced moderate difficulties in maintaining concentration, persistence or pace and experienced one or two episodes of decompensation, each of extended duration. (R. at 396.)

On June 14, 2007, Dr. Shirish Shahane, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, finding that Justus could perform medium work that did not require climbing ladders, ropes or scaffolds. (R. at 400-06.) He imposed no manipulative, visual or communicative limitations. (R. at 402-03.) Dr. Shahane found that Justus should avoid

concentrated exposure to fumes, odors, dusts, gases, poor ventilation and the like. (R. at 403.) Justus's statements were found partially credible. (R. at 406.)

On September 28, 2007, Justus returned to Dr. Tacas Tacas with complaints of anxiety and panic attacks, worse when talking to people. (R. at 411.) She agreed to see a psychiatrist. (R. at 411.) Examination of the respiratory system was the same as in April 2007. (R. at 413.) Dr. Tacas Tacas diagnosed aggravated anxiety. (R. at 414.) On October 24, 2007, Justus had no acute complaints. (R. at 407-10.) Again, examination of Justus's respiratory system remained unchanged. (R. at 409.) Dr. Tacas Tacas diagnosed chronic anxiety, controlled. (R. at 410.)

Justus saw Jenny Pruitt, a physician's assistant at Community Medical Care, on November 19, 2007, for a routine follow-up and medication check. (R. at 478-82.) It was noted that Justus's shortness of breath remained controlled on an inhaler. (R. at 479.) She had no recent history of coughing, unclear phlegm, hemoptysis, wheezing, pain on breathing, chest congestion or recent inhalant exposure. (R. at 479.) Her depression, anxiety and panic attacks remained controlled with medication. (R. at 479.) Physical examination of the respiratory system revealed the bony thorax was intact without deformities, there was symmetric chest expansion bilaterally, normal respiratory rate and pattern, bilaterally resonant lung fields, equally palpable vibrations, diminished breath sounds, no rales, no rhonchi, no wheezing and no pleuritic rubs. (R. at 481.) Pruitt noted that Justus's anxiety was stable. (R. at 481.) She diagnosed chronic anxiety, controlled. (R. at 481.)

- 8 -

On December 14, 2007, Dr. Michael Hartman, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, finding that Justus could perform medium work that did not require climbing ladders, ropes or scaffolds. (R. at 431-37.) Dr. Hartman imposed no manipulative, visual or communicative limitations, but he found that Justus should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation and the like. (R. at 433-34.) Dr. Hartman found Justus's statements partially credible. (R. at 437.)

That same day, Louis Perrott, Ph.D., a state agency psychologist, completed a Mental Residual Functional Capacity Assessment, identical to the one completed by Milan six months previously. (R. at 438-41.)

On December 17, 2007, Justus saw Angela Coleman, another physician's assistant at Community Medical Care, and it was again reported that her shortness of breath was stable on an inhaler. (R. at 483-87.) It also was noted that her depression, anxiety and panic attacks were controlled with medication. (R. at 484.) Coleman reported that Justus was well-developed, obese, alert, not acutely ill and was cooperative. (R. at 485.) Examination of Justus's respiratory system was normal except for continued diminished breath sounds. (R. at 486.) Coleman diagnosed chronic anxiety disorder, controlled. (R. at 486.)

When Justus saw Dr. Tacas Tacas on January 11, 2008, it was noted that her shortness of breath was stable on an inhaler, and her depression, anxiety and panic attacks remained controlled with medication. (R. at 488-91.) Examination of Justus's respiratory system was normal except for diminished breath sounds. (R. at 490.) Justus's anxiety was deemed aggravated. (R. at 491.)

Justus saw Dr. Uzma Ehtesham, M.D., a psychiatrist, on January 30, 2008. (R. at 459-60.)  She was alert and oriented with a sad mood and restricted affect. (R. at 460.)  Dr. Ehtesham diagnosed major depressive disorder and panic disorder. (R. at 460.)  She prescribed Ativan, Lexapro and trazodone.  (R. at 460.)

On February 7, 2008, Justus's shortness of breath, as well as her depression, anxiety and panic attacks, were stable on medication. (R. at 493.)  Physical examination of Justus's respiratory system was unremarkable, including normal vesicular breath sounds.  (R. at 494.)  Dr. Tacas Tacas deemed Justus's anxiety stable.  (R. at 495.)  When Justus saw Pruitt on February 26, 2008, she complained of a productive cough, yellowish phlegm, shortness of breath, stable on an inhaler, but aggravated, wheezing and pain in the lungs on deep inspirations, with cough and chest congestion.  (R. at 498.)  Her depression, anxiety and panic attacks were stable on medication.  (R. at 498.)  Physical examination of Justus's respiratory system was normal except for diminished breath sounds and generalized expiratory wheezes.  (R. at 500.)  Pruitt deemed her anxiety stable, and she diagnosed Justus with acute upper respiratory infection, acute cough and acute asthma exacerbation, and she ordered a chest x-ray.  (R. at 500-01.)  Justus also was given an order for a home nebulizer.  (R. at 501.)

On March 19, 2008, Justus's affect was depressed, and her mood was anxious.  (R. at 476.)  Sensorium and memory were intact, thought content was unremarkable, thought process was linear, and judgment was normal.  (R. at 476.)  Dr. Ehtesham diagnosed Justus with major depressive disorder without psychosis. (R. at 476.)

Justus returned to Dr. Tacas Tacas on March 27, 2008, at which time, her upper respiratory symptoms had resolved. (R. at 502-05.) Justus continued to report stable depression, anxiety and panic attacks with medication. (R. at 503.) Physical examination of Justus's respiratory system was normal. (R. at 504-05.) Dr. Tacas Tacas deemed her anxiety stable. (R. at 505.)

Justus returned to Dr. Ehtesham in April 2008, at which time she was doing fairly well. (R. at 477.) She reported two deaths in the family, but noted that she was sleeping fairly well and that her depression was doing fairly well. (R. at 477.) She reported worsened anxiety. (R. at 477.) Justus's mood was anxious, her sensorium and memory were intact, thought content was unremarkable, thought process was linear, and judgment was normal. (R. at 477.) Dr. Ehtesham increased Justus's dosages of Lexapro and Valium. (R. at 477.)

On May 16, 2008, Justus noted that her asthma was helped with nebulized medications. (R. at 507.) She reported that her shortness of breath and wheezing were stable on inhalers, and her depression, anxiety and panic attacks also were stable on medication. (R. at 508.) Examination of Justus's respiratory system was normal except for diminished breath sounds. (R. at 509.) Dr. Tacas Tacas deemed Justus's anxiety stable. (R. at 510.)

On May 20, 2008, Dr. Ehtesham noted that Justus was doing fairly well, with the exception of worsened anxiety. (R. at 475.) Justus was agitated, had excessive worry, fatigue, irritability, poor concentration, sadness, low self-esteem, psychomotor retardation, fair hygiene, intermittent eye contact and an anxious affect with congruent mood. (R. at 475.) Insight was fair, judgment was intact,

- 11 -

reality testing was improved, and thought processes were goal oriented. (R. at 475.) Dr. Ehtesham increased her dosage of Valium. (R. at 475.) On June 30, 2008, when Justus returned to Dr. Ehtesham, she reported worsened anxiety with longer-lasting panic attacks. (R. at 474.) Dr. Ehtesham observed excessive fatigue and irritability, trembling, sweating, sadness, low self-esteem, hopeless, psychomotor retardation and agitation. (R. at 474.) Justus's affect was anxious with a congruent mood. (R. at 474.) Her insight was fair/poor, but thought processes were goal-oriented. (R. at 474.) Dr. Ehtesham prescribed Xanax for intense anxiety. (R. at 474.)

When Justus saw Dr. Tacas Tacas on July 16, 2008, she complained of anxiety and stress. (R. at 515.) She appeared anxious. (R. at 516.) Examination of Justus's respiratory system was normal. (R. at 516.) On August 13, 2008, Justus again complained of anxiety and stress and requested a refill of Xanax because she was unable to follow-up with Dr. Ehtesham. (R. at 518-19.) She appeared anxious. (R. at 520.) Dr. Tacas Tacas wrote her a prescription for only one week. (R. at 518.) An examination of Justus's respiratory system was normal. (R. at 520.) Dr. Tacas Tacas diagnosed an aggravated anxiety. (R. at 520.)

On August 21, 2008, Justus complained of anxiety. (R. at 472.) She was agitated, fatigued and irritable. (R. at 472.) She had no depression, but reported auditory hallucinations. (R. at 472.) Justus's affect was anxious with a congruent mood. (R. at 472.) Insight was fair, judgment was fair, reality testing was improved, and thought processes were goal-oriented. (R. at 472.) Dr. Ehtesham prescribed Abilify and Xanax and increased the dosage of trazodone. (R. at 472-73.)

- 12 -

Justus saw Dr. Vijay Kumar, M.D., at Community Medical Care, on September 25, 2008. (R. at 522-25.) She complained of a dry cough and anxiety and stress. (R. at 523.) An examination of Justus's respiratory system was normal. (R. at 524.) Dr. Kumar deemed her mental status anxious. (R. at 524.) She was diagnosed with an acute cough and chronic uncontrolled anxiety state. (R. at 524.)

Justus saw Dr. Mina Patel, M.D., on May 4, 2009, for a psychological consultative examination at the request of Disability Determination Services. (R. at 462-68.) Justus stated that being around people made her nervous. (R. at 462.) She stated that she had suffered from panic attacks since 1998, noting that they occurred approximately two to three times weekly. (R. at 463.) Justus stated that she did not then-currently have much of a problem with depression, but when she did, she had crying spells. (R. at 463.) She reported that she attempted suicide by overdose in 2007 and was hospitalized for seven days. (R. at 463-64.) Justus denied any active suicidal or homicidal ideation. (R. at 464.) Justus stated that she was seeing a therapist for emotional problems. (R. at 464.)

Justus reported that she liked to walk and read books, but, at times, felt like she had lost interest in such activities. (R. at 464.) She reported staying nervous all the time, noting shakiness, playing with her fingers and biting her nails. (R. at 465.) Justus reported mainly staying at home or with her mother. (R. at 465.) She stated that she could keep her house clean and go grocery shopping with her mother or her boyfriend's sister. (R. at 465.) She stated that she sometimes watched movies on television and listened to the radio. (R. at 465.) Justus reported that Lexapro and trazodone had helped her depression, but not the panic

- 13 -

attacks.  (R. at 465.)  She noted taking Klonopin and Xanax on a regular basis in the past, but that her current medical doctor would not prescribe them.  (R. at 465.)

Justus described her mood as mainly nervous and depressed at times.  (R. at 467.)  Her affect was appropriate with ideation.  (R. at 467.)  Her speech was logical, coherent and relevant.  (R. at 467.)  No circumstantiality or tangentiality was noted, and thought processes did not reveal any looseness of associations or flights of ideas.  (R. at 467.)  Justus did not report any hallucinations, and no delusions were elicited.  (R. at 467.)  She reported no manic episodes, obsessive-compulsive behavior or any other abnormal behavior.  (R. at 467.)  She also did not report any paranoia or suspiciousness.  (R. at 467.)  Justus reported no then-current suicidal or homicidal ideation.  (R. at 467.)  Her insight was fair, and her judgment was intact.  (R. at 467.)

Dr. Mina Patel diagnosed panic disorder without agoraphobia; depressive disorder, not otherwise specified; rule out substance abuse; migraine headaches; and hepatitis B and C; and she assessed Justus's then-current GAF score as 55.  (R. at 467.)

Dr. Mina Patel also completed a Medical Source Statement Of Ability To Do Work-Related Activities (Mental) on May 21, 2009, finding that Justus was moderately limited in her ability to understand, remember and carry out complex instructions, to make judgments on complex work-related decisions, to interact appropriately with the public, to interact appropriately with supervisors, to interact appropriately with co-workers and to respond appropriately to usual work situations and to changes in a routine work setting.  (R. at 469-71.)

- 14 -

When Justus saw Dr. Haresh Patel, M.D., on April 15, 2009, her lungs had "fair" bilateral entry with vesicular breathing. (R. at 527.) There were no wheezes, rales or rhonchi. (R. at 527.) Justus returned to Dr. Haresh Patel on May 19, 2009, with complaints of backache and insomnia due to anxiety. (R. at 526.) At that time, her lungs were clear to auscultation and percussion. (R. at 526.)

Justus presented to Stone Mountain Health Services on July 29, 2009, with complaints of worsened panic and anxiety attacks, as well as depression and asthma, among other things. (R. at 532-36.) She reported that she had taken Cymbalta, which had helped more than Lexapro or Trazadone. (R. at 532.) She reported using an Albuterol inhaler. (R. at 532.) Justus had no wheezing on examination. (R. at 533.) She was fully oriented with a normal mood and affect. (R. at 533.) The records reflect that Justus was diagnosed with depression with anxiety and panic attacks and prescribed Cymbalta, trazodone, Ativan, Motrin and Proventil. (R. at 534.)[5]

On August 19, 2009, Justus saw Dr. Ravi Titha, M.D., for a consultative evaluation at the request of Disability Determination Services. (R. at 537-41.) Justus reported that her depression was getting "worse and worse," stating that medication helped to some degree, but that she continued to get episodes of crying and anger. (R. at 537.) Justus also reported panic attacks. (R. at 538.) She denied shortness of breath. (R. at 538.) Dr. Titha noted that Justus was in no acute distress, and she was pleasant and cooperative. (R. at 539.) Her lungs were clear to auscultation without rales, wheezing or rhonchi. (R. at 539.) Her appearance, behavior and speech were normal, thought processes and content were normal,

---

[5] The treating physician's signature on this record is illegible.

concentration and attention were normal, judgment and insight were normal, attitude and degree of cooperation were normal, and fund of information seemed adequate. (R. at 540.) Dr. Titha diagnosed depression, among other things. (R. at 540.)

On August 26, 2009, Dr. Titha completed a Medical Source Statement Of Ability To Do Work-Related Activities (Physical), finding that Justus could frequently lift and carry items weighing up to 50 pounds and occasionally lift and carry items weighing up to 100 pounds. (R. at 543-49.) Dr. Titha found that Justus could sit for a total of up to seven hours in an eight-hour workday, stand for a total of up to seven hours in an eight-hour workday and walk for a total of up to seven hours in an eight-hour workday. (R. at 544.) He found that Justus could sit for up to five hours without interruption, stand for up to four hours without interruption and walk for up to four hours without interruption. (R. at 544.) He found that Justus did not require the use of a cane. (R. at 544.) Dr. Titha found that Justus could use both hands frequently for reaching, handling, fingering, feeling and pushing/pulling, and that she could frequently use both feet for the operation of foot controls. (R. at 545.) He further found that Justus could frequently climb stairs and ramps, ladders and scaffolds, balance, stoop, kneel, crouch and crawl. (R. at 546.) Dr. Titha found that none of Justus's impairments affected her hearing or vision. (R. at 546.) Dr. Titha found that Justus could frequently work around unprotected heights, moving mechanical parts, operate a motor vehicle, work around humidity and wetness, dust, odors, fumes and pulmonary irritants, extreme cold, extreme heat and vibrations. (R. at 547.) He found that Justus could work around moderate noise. (R. at 547.) Dr. Titha opined that she could perform activities like shopping, traveling without a companion for

assistance, walking without using a wheelchair, walker, or two canes or crutches, walking a block at a reasonable pace on rough or uneven surfaces, use standard public transportation, climb a few steps at a reasonable pace with the use of a single hand rail, prepare a simple meal and feed herself, care for personal hygiene and sort, handle and use paper files. (R. at 548.)

Justus saw Ralph Ramsden, Ph.D., a licensed clinical psychologist, on October 14, 2009, at the referral of the Department of Social Services as a prerequisite to the return of custody of her two children. (R. at 550-60.) Justus was described as a cooperative, polite and respectful individual who showed good effort and motivation throughout the assessment. (R. at 550.) She attended well and showed no apparent difficulties with concentration. (R. at 550.) She presented with no overt symptoms of depression, but appeared mildly anxious/tense. (R. at 550.) Justus reported a limited mental health treatment history. (R. at 553.) She was admitted to Southwest Virginia Mental Health Institute in 2006 after a suicide attempt with pills, but received no follow-up outpatient services at that time. (R. at 553.) She denied any then-current thoughts of hurting herself or others. (R. at 554.) In 2007, the Department of Social Services took her to The Laurels, and she received outpatient drug abuse counseling at Cumberland Mountain Community Services. (R. at 553.) Justus stated that she would be receiving additional drug abuse counseling in the near future. (R. at 553.) Justus reported depression, which Cymbalta "seem[ed] to help a lot." (R. at 553.) She first identified symptoms of depression after the birth of her nine-year-old son, but also recalled reporting sadness to her parents as a young child. (R. at 553-54.)

In addition to depression, she also described mood swings, anxiety, panic attacks and frequent worrying. (R. at 554.) She reported becoming "nervous around people." (R. at 554.) She stated that she got "shaky and [her] mind [went] blank." (R. at 554.) Justus stated that she had panic attacks about once or twice monthly lasting approximately 30 to 40 minutes. (R. at 554.)

Ramsden administered the Wechsler Adult Intelligence Scale – Fourth Edition, ("WAIS-IV"), on which Justus obtained a full-scale IQ score of 72, placing her in the borderline range of functioning. (R. at 555.) Ramsden also administered the Millon Clinical Multiaxial Inventory – Third Edition, ("MCMI-3"), which indicated major depression, significant anxiety symptoms and extensive somatic complaints. (R. at 556.) Ramsden also administered the Beck Depression Inventory-Second Edition, ("BDI-2"), on which Justus obtained a raw score well below the cut-offs for clinical depression. (R. at 557.)

Ramsden diagnosed opioid dependence in early full remission; depressive disorder, not otherwise specified; adjustment disorder with anxiety and depression; borderline intellectual functioning; and personality disorder, not otherwise specified, with dependent features. (R. at 559.) He placed Justus's then-current GAF score at 55. (R. at 559.) Ramsden recommended individual psychotherapy for Justus to address the long-term depression as well as her then-current anxiety symptoms including panic attacks. (R. at 560.) He encouraged that the focus of such treatment should minimize the use of psychotropic medications that would have potential for dependency, instead, focusing on cognitive behavioral interventions to better control her symptoms. (R. at 560.) Further, Ramsden opined that individual therapy would need to address the passive-aggressive and

- 18 -

dependent personality characteristics as they affect emotional and behavioral stability in the home. (R. at 560.)

When Justus saw Dr. Haresh Patel on January 19, 2010, examination of her lungs showed fair bilateral air entry and vesicular breathing. (R. at 561.) Justus saw Dr. Hareshbhai Patel at Buchanan General Hospital on April 17, 2010, with complaints of epigastric abdominal pain with persistent coffee ground vomiting four to five times with watery diarrhea. (R. at 584-86.) At that time, her lungs were noted as "negative." (R. at 584.) Physical examination showed the trachea was central, there was bilateral equal chest excursion with vesicular breathing and no wheezing, rales or rhonchi. (R. at 585.)

When Justus saw Dr. Jashbhai Patel on May 5, 2010, physical examination showed good respiratory effort, no intercostal retraction and no accessory muscle use. (R. at 590.) Her lungs were clear with no rales, no rhonchi and no rubs. (R. at 590.) On May 7, 2010, when Justus was again hospitalized with epigastric abdominal pain, she denied shortness of breath, cough, expectoration or hemoptysis. (R. at 592-93.) She reported some nervousness, but denied depression. (R. at 593.) Physical examination showed good respiratory effort with no intercostal retraction and no accessory muscle use. (R. at 593.) Justus's lungs were clear to auscultation, and there were no rales, rhonchi or rubs. (R. at 593.)

Justus was again hospitalized with the same complaints on May 19, 2010. (R. at 595-96.) She again denied shortness of breath, cough, expectoration or hemoptysis. (R. at 596.) She noted some nervousness, but denied depression. (R. at 596.) Physical examination showed a good respiratory effort with no intercostal

retraction and no use of accessory muscles. (R. at 596.) Justus's lungs were clear to auscultation with no rales, rhonchi or rubs. (R. at 596.)

Justus saw Dr. Sujata R. Gutti, M.D., at Pikeville Neurology Clinic, on June 2, 2010, for evaluation of headache and diffuse muscle pain. (R. at 601-03.) Physical examination revealed normal breath sounds with no rales, symmetrical diaphragm movements and symmetrical intercostal retraction. (R. at 601.) She had clear breath sounds, and no wheezes or rales were noted. (R. at 601.) Justus was fully oriented with intact recent and remote memory. (R. at 602.) Her attention and concentration and language and speech were normal with good comprehension and repetition. (R. at 602.) Naming was intact, and vocabulary was normal, as was fund of knowledge. (R. at 602.)

## III. Analysis

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2011); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2011).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2011); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Justus argues that the ALJ's residual functional capacity finding is not supported by substantial evidence because he erred by failing to consider her asthma and its effect on her ability to work. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 8-11.) Additionally, Justus argues that the ALJ erred by apparently rejecting, without explanation, the portions of the opinions of two state agency physicians placing limitations on her as a result of her asthma. (Plaintiff's Brief at 8-11.) Justus also argues that the Commissioner has failed to show that there is a significant number of jobs existing in the national economy that she can perform because the hypothetical to the vocational expert that the ALJ relied upon in making such a finding was flawed. (Plaintiff's Brief at 11-14.)

First, I find that the ALJ did, in fact, err by failing to explain why he rejected those portions of the state agency physicians' opinions imposing restrictions on Justus based on her asthma, especially in light of the fact that the ALJ stated that he was giving great weight to those opinions. The ALJ found that Justus has the

residual functional capacity to perform the full range of medium work that did not require more than short, simple tasks or more than occasional interaction with co-workers or the public.  (R. at 18-21.)  On June 14, 2007, and on December 14, 2007, state agency physicians Dr. Shahane and Dr. Hartman, respectively, opined that Justus should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation and the like.  (R. at 403, 434.)  The record clearly shows that Justus suffers from asthma and consistently uses an inhaler with occasional use of nebulized medication for flare-ups. The ALJ, in his decision, noted only that Justus's asthma was controlled with medication.  (R. at 19.)  The ALJ also stated that he was giving great weight to the state agency physicians because their opinions were consistent with the evidence of record as a whole in describing Justus's ability to perform work-related activities.  (R. at 21.)

It is well-settled that in determining whether substantial evidence supports the ALJ's decision, the court also must consider whether the ALJ sufficiently explained his findings and his rationale in crediting evidence.  *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).  "[T]he [Commissioner] must indicate explicitly that all relevant evidence has been weighed and its weight."  *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979).  "The courts … face a difficult task in applying the substantial evidence test when the [Commissioner] has not analyzed all evidence.  Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'"  *Arnold v.*

- 22 -

*Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

Here, while the ALJ explicitly stated that he was giving great weight to the state agency physicians' opinions, he obviously rejected those portions of the opinions that imposed limitations on Justus's ability to work around various respiratory irritants. The ALJ made no mention of these limitations, nor did he explain why he apparently rejected them in his ultimate residual functional capacity finding. As stated above, the only reference the ALJ made to Justus's asthma was that it was controlled. However, there is evidence in the record that, while inhalers generally controlled it, Justus experienced flare-ups that needed to be treated otherwise. Also, the fact that her asthma was generally controlled with inhalers does not necessarily mean it has no effect on her ability to work or that she can perform in all workplace environments without limitation. For these reasons that I cannot find that substantial evidence supports the ALJ's physical residual functional capacity finding.

Next, Justus argues that the Commissioner failed to sustain his burden of showing that a significant number of jobs exist in the national economy that she can perform because the hypothetical posed to the vocational expert, upon which the ALJ relied, did not match the residual functional capacity to perform medium work that required no more than short, simple instructions, occasional interaction with the public and occasional interaction with co-workers. (R. at 18.) The hypothetical to the vocational expert was as follows:

I want you to assume that we have a 31-year-old individual with a seventh-grade education and the vocational profile as she's discussed and you've summarized, essentially, no significant work activity. And I want you to assume from a physical standpoint she can perform at the level identified by Dr. [Titha] … but from a psychological standpoint she can only perform at the level identified by Dr. [Mina] Patel . …"

(R. at 42.)  As for Justus's physical limitations, contrary to the Commissioner's argument in his brief, Dr. Titha's limitations were not more restrictive than the ALJ's residual functional capacity finding.  In particular, Dr. Titha found that the hypothetical individual could occasionally lift and carry items weighing up to 100 pounds and frequently lift and carry items weighing up to 50 pounds, reflecting a residual functional capacity for heavy work.  (R. at 544.)  Obviously, this is inconsistent with a finding that an individual can perform medium work. Additionally, the ALJ specifically noted in his decision that he was giving Justus the benefit of the doubt in according less weight to Dr. Titha's finding that she could perform work at the heavy exertional level.  (R. at 20.)  However, because Dr. Titha also found that Justus could frequently work around humidity, wetness, dust, odors, fumes and pulmonary irritants, and, given my previous finding regarding the ALJ's error in failing to explain his apparent rejection of the state agency physicians' opinions in this regard, I cannot find that substantial evidence supports the Commissioner's finding that a significant number of jobs exist in the national economy that Justus can perform on this ground as well.

As for psychological limitations, the ALJ asked the vocational expert to consider those contained in the mental assessment completed by Dr. Mina Patel in May 2009.  (R. at 42, 469-71.)  In that assessment, Dr. Patel opined that Justus was

- 24 -

moderately limited in the ability to understand, remember and carry out complex instructions, to make judgments on complex work-related decisions, to interact appropriately with the public, to interact appropriately with supervisors, to interact appropriately with co-workers and to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 469-70.) "Moderately" is defined on this assessment as having more than a slight limitation, but retaining the ability to function satisfactorily. (R. at 470.) As stated above, the ALJ found that Justus had the residual functional capacity to perform medium work that required the performance of no more than short, simple instructions and no more than occasional interactions with co-workers and with the public. (R. at 18-21.) Because the hypothetical to the vocational expert did not contain the restriction to the performance of no more than short, simple instructions, I cannot find that substantial evidence supports the Commissioner's finding that a significant number of jobs exist in the national economy that Justus can perform.

### PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence does not exist in the record to support the ALJ's physical residual functional capacity finding;

2. Substantial evidence does not exist in the record to support the Commissioner's finding that a significant number of jobs exist in the national economy that Justus can perform; and

3. Substantial evidence does not exist in the record to support the ALJ's finding that Justus was not disabled under the Act and was not entitled to SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court grant Justus's motion for summary judgment, deny the Commissioner's motion for summary judgment, vacate the Commissioner's decision denying benefits and remand this case to the Commissioner for further consideration consistent with this Report and Recommendation.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2011):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to

the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     May 9, 2012.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE